MANUFACTURING REPAIR &
OVERSTOCK, INC.,      )
     )      Case No. 1:24-cv-268
     )
     *Plaintiff*,      )      Judge Travis R. McDonough
     )
v.      )      Magistrate Judge Michael J. Dumitru
     )
KASINGER, et al,      )
     )
     *Defendants*.

---

## MEMORANDUM OPINION

---

Before the Court are two motions to dismiss: (1) Defendants Justin M. Wilson and Automation Hub, LLC's motion to dismiss Plaintiff Manufacturing Repair & Overstock, Inc.'s ("MRO") second amended complaint for lack of personal jurisdiction and failure to state a claim or, in the alternative, to change venue (Doc. 12); and (2) Defendant Caleb Kasinger's motion to dismiss for failure to state a claim (Doc. 14).[1] For the following reasons, the Court will (1) **GRANT** Wilson and Automation Hub's motion to dismiss for lack of personal jurisdiction, without reaching their motion to dismiss for failure to state a claim (Doc. 12); and (2) **RESERVE IN PART**, **GRANT IN PART**, and **DENY IN PART** Kasinger's motion to dismiss for failure to state a claim (Doc. 14). The Court will further **ORDER** Plaintiff to amend its complaint pursuant to the reserved issue, as provided in the Conclusion of this Order.

---

[1] This motion to dismiss was filed originally by both Kasinger and Scott Darter. (*See id.*) On March 31, 2025, MRO and Darter filed a joint motion to dismiss the claims against him (Doc. 42), which the Court granted (Doc. 43). Thus, this motion is now moot to the extent it pertains to Darter—but still pending as to Kasinger.

# I. BACKGROUND

## A. Factual Background

MRO is a Tennessee corporation with its principal place of business in Tennessee. (*See* Doc. 10, at 2.) Defendant Justin M. Wilson is a former owner of MRO and a former resident of Tennessee. (*See id.* at 4.) In 2019, while still with MRO, Wilson relocated to Arkansas "for purposes of opening an Arkansas operation for MRO" ("MRO Arkansas"). (*Id.*) According to Wilson, his family relocated with him when he moved to start MRO Arkansas, and he has not been back to Tennessee since July 2022, when he "briefly visited for reasons related to [his] exit from MRO." (Doc. 13-1, at 2.) While Wilson was still running MRO Arkansas, MRO hired Defendant Caleb Kasinger and Scott Darter[2] to work at MRO Arkansas. (*See* Doc. 10, at 4–7.)

On June 13, 2019, MRO and Kasinger executed an agreement titled, "NONCOMPETITION AND NON-SOLICITATION AGREEMENT" (the "Agreement"), which MRO alleges Wilson presented to him. (*See id.* at 3–4; Doc. 10-1.) The Agreement provides, in relevant parts, the following[3]:

---

[2] Although the claims against Darter have been dismissed, the Court discusses allegations involving him as needed to provide context for MRO's claims against the remaining defendants.

[3] MRO attached a copy of the Agreement to its complaint (Doc. 10-1), and its complaint includes detailed allegations quoting or otherwise discussing all of the provisions the Court transcribes here (*see* Doc. 10, at 5–6). Kasinger does not dispute that these representations of the Agreement are accurate. (*See generally* Docs. 15, 23.)

Additionally, though Federal Rule of Civil Procedure Rule 12(d) provides that a court's consideration of evidence outside the pleadings requires it to treat a motion to dismiss as a motion for summary judgment, the Sixth Circuit has found the attachment of documents like copies of contract provisions to a pleading does not trigger Rule 12(d) when the attachment "add[s] nothing new, but, in effect, reiterate[s] the contents of the complaint itself." *Song v. City of Elyria, Ohio*, 985 F.2d 840, 842 (6th Cir. 1993). Accordingly, the inclusion of the Agreement does not convert Kasinger's Rule 12(b)(6) motion to one for summary judgment. For ease of reference, the Court will generally cite to the attached copy of the Agreement (Doc. 10-1) when discussing MRO's contract-based allegations.

WHEREAS, Employee acknowledges and agrees that as a result of Employee's position with the Company, Employee will be provided: (i) access to confidential and proprietary Company information, including trade secrets; (ii) specialized training; and (iii) the opportunity to develop relationships with Company customers due to the Company's investment in Employee, through training or otherwise, as well as the confidential and proprietary information provided to Employee by the Company. As a result, Employee acknowledges and agrees that engaging in business competitive with the Company would cause the Company irreparable harm . . .

2.    <u>Non-Competition</u>.

(a)    Employee agrees that, during Employee's employment with the Company, Employee will not engage in, on Employee's own behalf or on behalf of or with any other person, firm, corporation or other entity (except for and on behalf of the Company), directly or indirectly, the sale of products or services competitive with the products or services the Company currently markets and/or sells.

(b)    Upon Employee's termination of employment with the Company for any reason, Employee agrees not to engage in, on Employee's own behalf or on behalf of or with any other person, firm, corporation or other entity, directly or indirectly, the marketing and/or sale of products or services the Company currently markets and/or sells, for a period of one (1) year beginning on the effective date of his/her termination. The restrictions in this paragraph shall be limited to a 50-mile radius of the Company's facility located at 2474 Clay Street, Chattanooga, TN 37406, as well as the following counties: (i) Davidson, Rutherford, Knox and Dyer counties, Tennessee; (ii) Gwinnett, Cobb, Forsyth, Dawson and Floyd counties, Georgia; as well as a 50-mile radius of any other locations in which Employee worked or to which Employee directed marketing, sales, or service activities during the one-year period preceding the date of Employee's termination.

3.    <u>Non-Solicitation</u>. Employee further agrees not to, directly or indirectly, during Employee's employment with the Company and for a period of one (1) year thereafter:

. . . (b)    Solicit, contact, call upon, communicate with, attempt to solicit or communicate with or do business with any customer, former customer or prospective customer of the Company for the purpose of engaging in business competitive with the Company . . .

4.    <u>Confidential and Proprietary Information</u>. Employee acknowledges that Employee has, and will continue to have, possession of confidential and proprietary information and knowledge as to the Company's business and its

3

customers, including, but not limited to, knowledge of the Company's products and services, customer lists and records, customer preferences, information regarding sales, costs, pricing, marketing, contracts with third parties, computer programs, business and strategic plans, financial forecasts, data (including cost data), methods, customer uses and requirements, inventions and copyrights, as well as other information that derives economic value, directly or indirectly, from being confidential or proprietary to or trade secrets of the Company ("Confidential Information"). . . .  Employee agrees that such Confidential Information is and shall remain the Company's property and that, upon termination of employment, Employee will not use or disclose or cause to be disclosed any Confidential Information to any third person, partnership, joint venture, company, corporation, other business organization or other third party. . .

5.      Injunctive Relief.  Employee acknowledges and agrees that the services Employee renders to the Company, and the Confidential Information disclosed to or otherwise obtained by Employee during and by virtue of Employee's employment, are of a special, unique and extraordinary character, and the breach of any provision of this Agreement will cause the Company irreparable injury and damage.  Consequently, the Company shall be entitled, in addition to and without limitation of all other remedies available to it, to injunctive and equitable relief to prevent a breach or continued breach of this Agreement, or any part of it, and to secure the enforcement of this Agreement.  Such equitable remedies shall be cumulative and non-exclusive, in addition to any and all other remedies the Company may have.

6.      Extension of Covenants in the Event of Breach.  In the event Employee breaches the covenants expressed in Sections 2 and 3 above, the period of restraint shall automatically toll and extend the restraint during the period that the breach continues.

7.      Attorney Fees.  In the event the Company employs attorneys with regard to any legal action, arbitration, or other proceeding to enforce or defend this Agreement (including but not limited to a resolution of any dispute regarding the forum) then the Company, in addition to any other relief which may be granted, shall be entitled to recover all costs, expenses, and attorney fees incurred in bringing such action, arbitration or proceeding, and in enforcing any judgment granted therein. . . .

9.      Governing Law; Exclusive Jurisdiction and Venue.  This Agreement shall be construed and enforced in accordance with the laws of the State of Tennessee. The parties agree that any proceeding or action brought by either party, or anyone on behalf of either party, under or in relation to this Agreement, including without limitation to interpret or enforce any provision of this Agreement, shall be brought exclusively in, and each party agrees to and does hereby submit to the jurisdiction and venue of, any state or federal court in Hamilton County, Tennessee.

4

(Doc. 10-1, at 1–3.)

Kasinger allegedly served as the Branch Manager for MRO Arkansas and the "head of robotics for MRO overall." (*See* Doc. 10, at 9.) According to MRO, "Kasinger was involved in every potential deal for MRO in the robotics space, was involved in developing marketing strategies and business plans for MRO and was charged with managing and growing MRO's market share in robotics." (*Id.*)

At some point between July 2022 and September 2023, Wilson left MRO. (*See* Doc. 13-1.) After his departure, according to Wilson's declaration, he started Defendant Automation Hub, an Arkansas limited liability corporation with headquarters in Rogers, Arkansas, in September 2023. (*See id.* at 2.) According to Wilson, Automation Hub is not registered to do business in Tennessee, does not own property or otherwise have an office in Tennessee, and does not employee any Tennessee residents. (*See id.*) He avers Automation Hub "engages in very limited sales in Tennessee," consisting of sales to four customers that represented approximately 3.5% of its business between its inception and October 2024. (*Id.*)

In February 2024, Kasinger and Darter allegedly resigned from MRO, and, by May 2024, they were working for Automation Hub. (*See* Doc. 10, at 12–14.) MRO alleges that Wilson recruited Kasinger and Darter despite knowing their acceptance of employment with Automation Hub would breach their contracts and, additionally, that Wilson nonetheless represented to Kasinger and Darter that their departures would not violate these contracts.[4] (*See id.* at 10–12.)

_____

[4] The contract MRO alleges Darter signed is an "At Will Employment Agreement" that appears to differ considerably from the Agreement MRO alleges Kasinger signed. (*See* Doc. 10, at 7–8; Doc. 10-2 (a purported copy of the contract executed between MRO and Darter).) Given Darter's dismissal, however, the Court need not consider the substance of this contract; all that is relevant to the remaining claims are the allegations summarized above.

5

Once employed by Automation Hub, Kasinger allegedly engaged in solicitations of MRO's third-party vendors and customers beRobox, Gexpro, and Industrial Solutions Authority. (*See id.* at 12–17.)  First, MRO alleges he solicited business from one of MRO's vendors, beRobox, a "robotics start-up company with a focus on palletizing robot technology that automates stacking pallets." (*Id.* at 9; *see id.* at 12.)  Then, Kasinger allegedly sent two successive solicitation emails to a representative of Gexpro, an MRO customer, seeking "Gexpro's business to purchase equipment from Automation Hub." (*Id.* at 14.)  In relation to the Gexpro solicitation, furthermore, MRO alleges that Kasinger sent the emails to an address that was not publicly available, "Curtis.Kingery@gexpro.com," and that "[u]pon information and belief, the formatting of Kasinger'[s] business solicitation emails on May 3, 2024, and May 8, 2024, utilized an MRO design template that Kasinger had access to during his employment at MRO." (*Id.* at 14–16.)  Lastly, MRO alleges that, not long before the filing of its second amended complaint, Kasinger solicited business from Industrial Solutions Authority, another one of MRO's vendors. (*See id.* at 17.)

### B. Procedural History

MRO filed its original complaint in state court on May 3, 2024, against Kasinger and Darter, without naming Wilson and Automation Hub as defendants. (*See* Doc. 37, at 1.)  On the same day, MRO moved for, and the state court granted, a temporary restraining order (the "TRO"). (*See id.*)  The TRO provides, inter alia, that "Defendants [Kasinger and Darter] . . . and all other persons acting in concert with the Defendants" are (1) restrained from contacting MRO employees to solicit any current MRO employee to work at Defendant's current employer, Automation Hub; and (2) "enjoined and restrained from contacting clients, customers, vendors and suppliers of MRO with the intent to induce any current client or customer of MTO to do

business with Automation Hub or not do business with MRO." (Doc. 35-1, at 2–3.)  The TRO does not provide an expiration date.  (*See id.*)  On July 8, 2024, MRO amended its complaint, adding Wilson and Automation Hub as defendants, after which they removed this action to this Court.  (*See* Doc. 37, at 2.)  MRO then filed its second amended complaint (the operative complaint now before the Court) on September 24, 2024.  (*See* Doc. 10.)

On December 23, 2024, Wilson and Automation Hub filed a motion to confirm the state-court issued TRO was not binding on them or, alternatively, that it had automatically expired. (*See* Docs. 31, 32.)  The Court denied that motion, finding that (1) the TRO is binding on Wilson and Automation Hub to the extent it bars them from acting in concert with Kasinger and Darter to violate the TRO; and (2) it has not automatically expired because it did not expire while in state court under either its terms or the Tennessee Rules of Civil Procedure and, once removed to federal court, 28 U.S.C. § 1450 preserves the TRO as it existed under state law until the Court issues an order dissolving or modifying it.  (Doc. 37.)

In its second amended complaint, MRO brings the following claims against the remaining defendants:  (1) breach of contract against Kasinger, (2) a corresponding declaratory judgment against Kasinger, (3) misappropriation of trade secrets in violation of the Tennessee Uniform Trade Secrets Act ("TUTSA") against all defendants, (4) misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA") against all defendants, (5) common law and statutory procurement of breaches of contract against Wilson and Automation Hub, (6) intentional interference with business relations against all defendants, (7) civil aiding and abetting against Wilson and Automation Hub, and (8) civil conspiracy.  (*See* Doc. 10, at 17–31.)  Wilson and Automation Hub move to dismiss all claims against them under Federal Rules

7

of Civil Procedure 12(b)(2) and 12(b)(6), and Kasinger moves to dismiss all claims against him under Rule 12(b)(6).  (*See* Docs. 12, 14.)  Both motions are now ripe for review.

## II.  WILSON AND AUTOMATION HUB'S MOTION TO DISMISS

### A.  Standard of Law

On a motion to dismiss pursuant to Rule 12(b)(2), the plaintiff bears the burden of establishing the existence of personal jurisdiction.  *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007).  "The court's exercise of personal jurisdiction must be both authorized by the forum State's long-arm statute and in accordance with the Due Process Clause of the Fourteenth Amendment."  *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016).  Tennessee's long-arm statute, Tennessee Code Annotated § 20-2-214, expands the jurisdiction of Tennessee courts to the full limit permitted by the Due Process Clause. *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 645–46 (Tenn. 2009); *see also Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 477 (6th Cir. 2003).  Therefore, the Court only needs to determine whether the exercise of personal jurisdiction violates constitutional due process.  *Aristech Chem. Int'l Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624, 627 (6th Cir. 1998).

Personal jurisdiction may be either general or specific.  *See Parker v. Winwood*, 938 F.3d 833, 839 (6th Cir. 2019).  General personal jurisdiction exists when a defendant's "affiliations with the [forum] State are so continuous and systematic as to render [it] essentially at home in the forum."  *Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014) (citing *Goodyear Dunlop Tires Overations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)) (internal quotations omitted).  To satisfy specific personal jurisdiction, the Due Process Clause "requires that an out-of-state defendant have 'minimum contacts' with the forum state sufficient to accord with 'traditional notions of fair play and substantial justice.'"  *Parker*, 938 F.3d at 839 (citations omitted).  "[W]hether a

forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (quotations and citations omitted). Specific jurisdiction "must arise out of contacts that the 'defendant himself' creates with the forum State" because due process "principally protect[s] the liberty of the nonresident defendant—not the convenience of plaintiffs." *Id.* at 284 (quotations and citations omitted). In accordance with these principles, the Sixth Circuit has articulated a three-part test for analyzing specific jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*AlixPartners*, 836 F.3d at 549–50 (quoting *Air Prods. & Controls, Inc.*, 503 F.3d at 550).

### B.    Analysis

The Court does not have general personal jurisdiction over either Wilson or Automation Hub, as both are—and were at all times relevant to this litigation—citizens of Arkansas, not Tennessee. *See Daimler AG*, 571 U.S. at 119; (Doc. 10, at 2–3). Although Wilson was formerly a Tennessee citizen, the complaint alleges he relocated to Arkansas, for the purpose of establishing MRO Arkansas, *before* engaging in the conduct for which MRO alleges he is now liable. (*See* Doc. 10, at 4; *see generally id.*) Automation Hub is a citizen only of Arkansas because it was incorporated and has its principal place of business in Arkansas. *See Daimler AG*, 571 U.S. at 119; (Doc. 10, at 3). Thus, if MRO's claims are to proceed against Wilson and Automation Hub in this Court, there must be specific jurisdiction. *See Parker*, 938 F.3d at 839.

In *Walden v. Fiore*, the Supreme Court emphasized that for specific personal jurisdiction to exist, "the plaintiff cannot be the only link between the defendant and the forum," 571 U.S. at

9

285, and its analysis in *Walden* is instructive here. *Walden* concerned a *Bivens* action filed against a Drug Enforcement Administration ("DEA") agent working at the Atlanta Hartsfield-Jackson International Airport, in which the plaintiffs, airline passengers who were traveling from Georgia to Nevada, alleged, inter alia, that the defendant wrongfully seized cash from the plaintiffs' bags with the knowledge that they were en route to Nevada and, later, helped draft a false affidavit purporting to show probable cause for forfeiture of those assets. *See id.* at 279–81. In reversing the Ninth Circuit's holding that there was specific jurisdiction over the DEA agent in Nevada, the Supreme Court explained that it has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum"; rather, for minimum contacts to exist, the defendant must "purposefully 'reach out beyond' their State and into another." *Id.* at 284, 285 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479–80 (1985)) (cleaned up). In cases involving intentional torts, therefore, "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct that creates the necessary contacts with the forum." *Id.* at 286. The passengers' allegations against the DEA agent did not meet this standard, the *Walden* court reasoned, because they suggested only that the agent "directed his conduct at plaintiffs whom he knew had Nevada connections"—not that his "conduct had anything to do with Nevada itself." *Id.* at 289. Holding otherwise, the Supreme Court explained, would undermine the Due Process underpinnings of the minimum-contacts inquiry by effectively making *the plaintiff's* contacts with the forum, not the defendant's, dispositive. *See id.*

Here, the facts alleged in the complaint do not suggest that Wilson and Automation Hub "purposefully reached out beyond" Arkansas "and into" Tennessee. *Id.* at 285 (internal citations and quotations omitted). On the contrary, their conduct is centered in Arkansas: Wilson had

been living in Arkansas and running MRO Arkansas for multiple years when he left and started Automation Hub, an Arkansas entity. (*See* Doc. 10, at 4, 9–17.) In starting Automation Hub, Wilson allegedly poached two former employees, Kasinger and Darter, who had only ever been employed by an MRO operation in Arkansas. (*See id.* at 9–12.) Then, once this Automation Hub team was assembled, it allegedly (1) contracted with a vendor, beRobox, with whom Kasigner had developed a close relationship while working at MRO Arkansas; (2) solicited business from an MRO customer, Gexpro; and (3) later contacted another MRO vendor, Industrial Solutions Authority, after the TRO was imposed. (*See id.* at 9, 12, 14, 17.) Nowhere in the complaint does MRO allege that any of these vendors or customers were Tennessee citizens, nor even that they had once contracted with MRO through its Tennessee headquarters or employees. (*See generally id.*) (If anything, given the facts alleged regarding Wilson, Kasigner, and Darter's work at MRO Arkansas and the creation of Automation Hub, there is reason to believe these vendors and customers are citizens of, or otherwise strongly connected to, Arkansas. (*See generally id.*)[5]

While MRO's response makes several arguments for personal jurisdiction, all are insufficient under *Walden* or otherwise unavailing. (*See* Doc. 20, at 2–3, 20–21.) Some of these arguments focus on how Wilson and Automation Hub "*knew precisely what they were doing* and how it would affect [MRO] in Tennessee," including that they "*knew that Kasinger and Darter signed employment contracts with a Tennessee company that were governed by Tennessee law,*" and that they "*knew that those contracts barred Kasinger and Darter from competing with a*

---

[5] It seems especially plausible that beRobox may be an Arkansas corporation given that the complaint alleges it "is an excellent but *small start-up company* in the palletizing industry, which is not yet a household name," and that its representatives attended a demonstration at Automation Hub's office in Arkansas. (*Id.* at 12 (emphasis added).)

Tennessee company, soliciting its customers, and using its confidential information." (*Id.* at 2 (emphases added); *see also id.* at 20.) But these arguments fail to show Wilson and Automation Hub had minimum contacts with Tennessee, as they are, in essence, about *MRO, Kasinger, and Darter's contacts*. Insofar as Wilson knew his conduct would impact "a Tennessee company" (*id.*), the Supreme Court made clear in *Walden* that a defendant's knowledge of another party's connections to a forum state cannot be the basis of personal jurisdiction over the defendant. *See* 571 U.S. at 284, 289 (explaining the Ninth Circuit erred by finding personal jurisdiction based on "petitioner's knowledge of respondents' strong forum connections" (citations and quotations omitted)).

To the extent MRO alleges Wilson had knowledge of Kasinger and Darter's connections to Tennessee, those allegations may sound in the "conspiracy theory" of personal jurisdiction, which the Sixth Circuit has neither adopted nor rejected. *See Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1237 (6th Cir. 1981) ("[W]e need neither adopt nor reject the 'conspiracy theory' of in personam jurisdiction as a general principle of law in this circuit."); *see also Chenault v. Walker*, 36 S.W.3d 45, 53–55 (Tenn. 2001) (outlining and adopting the theory in Tennessee). Though district courts within the Sixth Circuit have split on this issue,[6] those that have applied the theory have reasoned that "because the law considers each member of the conspiracy to be the agent of the other members . . . if one co-conspirator commits acts in the forum which would justify the forum court in exercising personal jurisdiction over it, those acts are attributed to the

---

[6] *Compare Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 410 F. Supp. 2d 592, 600 (E.D. Ky. 2006) ("[T]hese allegations are sufficient to meet the conspiracy theory of personal jurisdiction . . . [and] the better view is to recognize this doctrine in appropriate cases."), *with Singh v. Daimler, AG*, 902 F. Supp. 2d 974, 981 (E.D. Mich. 2012) ("This Court declines to find personal jurisdiction . . . based on a conspiracy theory because the Sixth Circuit has not adopted this theory of personal jurisdiction.").

other co-conspirators and personal jurisdiction exists over them as well." *Ky. Speedway*, 410 F. Supp. 2d at 599. In this case, however, exercising personal jurisdiction over Wilson and Automation Hub based on the conspiracy theory would be inconsistent with the Due Process Clause. *See Chenault*, 36 S.W.3d at 53–55 (adopting the theory on the ground that typical applications would "comport[] with due process"). The Court is not convinced, given its analysis of Wilson and Automation Hub's 12(b)(2) motion, that there would be personal jurisdiction over *Kasinger* in Tennessee were it not for the forum-selection clause in the Agreement he signed.[7] (*See* Doc. 10-1, at 3.) A forum-selection clause can be the basis for personal jurisdiction, provided it is freely negotiated, "because the personal jurisdiction requirement is a waivable right." *Burger King*, 471 U.S. 472 n.14 (citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982); *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). But this rule does not suggest that Kasinger's waiver in signing the Agreement can operate to waive *Wilson's or Automation Hub's* right to contest personal jurisdiction under the Due Process clause. Thus, the Court is not convinced it can exercise specific personal jurisdiction under the conspiracy theory when its jurisdiction over the alleged co-conspirator is based on a forum-selection clause alone (let alone one executed before the alleged conspiracy began). *See Chenault*, 36 S.W.3d at 53–55. Furthermore, the fact that Wilson allegedly conspired with Kasinger and Darter with the knowledge of their contracts *with MRO* is, once again, insufficient under *Walden* because it amounts to an allegation that Wilson

---

[7] That is, for the same reasons the Court finds in this section that Automation Hub's alleged conduct does not subject it to personal jurisdiction in Tennessee, none of the conduct in which Kasinger allegedly engaged as an agent of Automation Hub would "would justify the forum court in exercising personal jurisdiction over [him]." *Ky. Speedway*, 410 F. Supp. 2d at 599.

knew his conduct would harm a forum state plaintiff. *See* 571 U.S. at 284, 289; (Doc. 10, at 4, 7).

MRO also argues "the 'focal point of the damage' was in Tennessee," such that there is specific jurisdiction "[u]nder the effects test established in *Calder v. Jones*." (Doc. 20, at 21 (quoting *Scotts Co. v. Aventis S.A.*, 145 F. App'x 109, 114 (6th Cir. 2005))); *see Calder*, 465 U.S. 783 (1984). However, the facts alleged do not establish that the "focal point of the damage" alleged by MRO is in Tennessee. *Scotts Co.*, 145 F. App'x at 114. Instead, the story the complaint tells is that MRO sent Wilson to Arkansas with the purpose of developing business for MRO *in Arkansas*, and that Wilson subsequently usurped the gains MRO Arkansas made by starting a competing business, Automation Hub, *in Arkansas*, (*see generally* Doc. 10); the effects of Wilson and Automation Hub's alleged conduct would have been felt in the Arkansas robotics market.[8]

Finally, MRO argues there is personal jurisdiction over Wilson and Automation Hub because they knowingly violated the state-court TRO issued against Kasinger and Darter. (*See* Doc. 20, at 2–3, 20–21.) That TRO was issued by the Tennessee state court within hours of MRO's filing of its original complaint against Kasinger and Darter, at a time when Wilson and Automation Hub were not yet named as defendants. (*See* Doc. 35-1.) It is true that a district

---

[8] In addition, the *Walden* court distinguished *Calder* on the ground that it was a libel suit concerning an article written and edited by the defendants "for publication in the National Inquirer, a national weekly newspaper with a [forum state] California circulation of roughly 600,000." 571 U.S. at 286–87. "[B]ecause publication to third persons is a necessary element of libel," the Supreme Court reasoned, the *Calder* defendants' conduct did reach out to, or effect, California in a way that went beyond mere intention to harm a California plaintiff. *Id.* at 288. The same distinction applies here, as MRO's complaint does not suggest that Wilson and Automation Hub's conduct was directed towards Tennessee in a way that goes beyond an intent to take business or employees—*Arkansas-based* business and employees, no less—away from a Tennessee-based corporation. *See id.* at 286–88.

court may exercise jurisdiction over a nonparty who has allegedly acted in concert to violate the district court's order for the purpose of a contempt proceeding. *See S.E.C. v. Homa*, 514 F.3d 661, 674 (7th Cir. 2008) ("a person who knowingly circumvents a freeze order is subject to a show cause order and contempt and thereby submits to the jurisdiction of the court for contempt proceedings") (citing *Waffenschmidt v. MacKay*, 763 F.2d 711, 714 (5th Cir. 1985); Fed. R. Civ. P. 65). However, that rule is not controlling as to Wilson and Automation Hub's 12(b)(2) motion for two related reasons: First, the TRO in this case was issued by a different court (specifically, a state court prior to removal), and, as the Seventh Circuit explained in *Homa*, a district court's ability to exercise jurisdiction over non-parties in contempt proceedings is based in significant part on its "independent authority to enforce *its own* injunctive decrees." 514 F.3d at 673 (emphasis added). Second, this is not a contempt proceeding—while the complaint alleges Wilson and Automation Hub have violated the TRO, MRO has never asked this Court (in the complaint or otherwise) to hold them in contempt. (*See generally* Doc. 10.) Perhaps MRO has not done so, moreover, because the Court lacks authority to conduct contempt proceedings over another court's injunction: "civil contempt proceedings leave the offended judge *solely responsible* for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (emphasis added); *see Klett v. Pim*, 965 F.2d 587, 591 (8th Cir. 1992) (finding the "plain meaning" of the contempt statute, 18 U.S.C. § 401, "prevents a federal court from imposing a sanction for contempt of another court's injunction"); Fed. R. Civ. P. 4.1 Advisory Committee Notes to 1993 Amendment ("Contempt proceedings, whether civil or criminal, must be brought

in the court that was allegedly defied by a contumacious act") (citing *Ex parte Bradley,* 74 U.S. 366 (1869)).[9] Thus, the state-court-issued TRO provides no basis for personal jurisdiction here.

For all these reasons, the Court lacks personal jurisdiction over Wilson and Automation Hub, and it will grant their motion to dismiss.

## III.    KASINGER'S MOTION TO DISMISS

### A.    Standard of Law

According to Rule 8 of the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though the statement need not contain detailed factual allegations, it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion pursuant to Rule 12(b)(6). On a Rule 12(b)(6) motion, the Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct." *Id*. at 679. For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). This assumption of veracity, however, does not extend to bare assertions of

---

[9] Finally, even if this Court had been asked to and *could* hold Wilson and Automation Hub in contempt, MRO has cited no authorities for the proposition that jurisdiction for contempt proceedings can be a basis for specific personal jurisdiction over underlying claims. (*See* Doc. 20.)

legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

After sorting the factual allegations from the legal conclusions, the Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. This factual matter must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

**B.     Analysis**

MRO asserts the following causes of action against Kasinger: (1) breach of contract relating to the Employment Agreement, (2) a declaratory judgment regarding the Employment Agreement, (3) misappropriation of trade secrets in violation of the Tennessee Uniform Trade Secrets Act ("TUTSA"), (4) misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA"), (5) intentional interference with business relations, and (6) civil conspiracy. (*See* Doc. 10, at 17–31.) Kasinger moves to dismiss all claims under Rule 12(b)(6). (*See* Doc. 15, at 1–2.)

### i.    Contract Claims

MRO's contract claims include breach, on several grounds, and a corresponding declaratory-judgment claim as to the enforceability and tolling provisions of the Agreement.[10] (*See* Doc. 10, at 17–20.)  There are three elements to a breach-of-contract claim:  "[1] the existence of a valid and enforceable contract, [2] a deficiency in the performance amounting to a breach, and [3] damages caused by the breach."  *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).  MRO's complaint advances four specific theories in support of its breach-of-contract claim:  it alleges Kasinger breached the non-competition and non-solicitation clauses of the Agreement "when he (a) accepted employment with one of MRO's competitors; (b) solicited, directly and indirectly, business from beRobox; (c) solicited, directly and indirectly, business from Gexpro; and (d) solicited, directly and indirectly, business from Industrial Solutions Authority."[11]  (Doc. 10, at 18 (cleaned up).)

---

[10] The parties agree that MRO's claim for a declaratory judgment depends in significant part on the viability of its breach-of-contract claim.  (*See* Doc. 15, at 8; Doc. 21, at 11.)

[11] In MRO's response brief, it suggests Kasinger has not actually moved to dismiss the entirety of the breach-of-contract claim based on this theory:  "Manufacturing Repair alleged in its pleading that the parties' contracts contained confidentiality provisions . . .  Kasinger [has] not moved for dismissal of those claims.  So regardless of how the Court adjudicates any other part of the defendants' motion, Manufacturing Repair's contract claim will survive."  (Doc. 21, at 7.)  As a procedural matter, this argument is without merit because the complaint asserts *one* count—not multiple—of breach of contract, Count 1, which alludes to multiple potential theories for breach, and it is unmistakably clear from Kasinger's briefings that he is moving for dismissal of Count 1 in its entirety (*see* Doc. 15, at 1; Doc. 23, at 2–5).  (And a defendant's 12(b)(6) motion brief need not address every possible legal theory that would substantiate a claim in order for a court to grant dismissal of that claim.)

As to the scope of MRO's theories, the complaint's allegations regarding the confidentiality provision appear to fall into one of two categories:  (a) allegations that Kasinger utilized confidential information *in the course of* breaching of the non-competition and non-solicitation provisions of the Agreement, and (b) allegations relevant to MRO's trade secret claims.  (*See*, *e.g.*, *id.* at 18 ("Upon information and belief, Kasinger's solicitation was accomplished and is being accomplished through his knowledge and/or use of MRO's trade secrets and confidential information.").)  Therefore, to the Court's reading, the above-quoted summary of four theories of

a.    Breach Based on Acceptance of Employment with Automation Hub

"In general, covenants not to compete are disfavored in Tennessee." *Murfreesboro Med.*

*Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005) (citing *Hasty v. Rent-A-Driver, Inc.*,

671 S.W.2d 471, 472 (Tenn. 1984)).  As the Supreme Court of Tennessee has explained, "[t]hese

covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the

employee.  However, if there is a legitimate business interest to be protected and the time and

territorial limitations are reasonable then non-compete agreements are enforceable."

*Murfreesboro Med. Clinic*, 166 S.W.3d at 678 (internal citation omitted); *see Allright Auto*

*Parks, Inc. v. Berry*, 409 S.W.2d 361, 364 (Tenn. 1966) (finding a non-competition agreement

unenforceable when "were th[e] Court to uphold the contract, the defendant would be precluded

from competing in forty-six cities throughout the United States and Canada").

Here, the non-competition provision of the Agreement contains express time and

territorial limitations:  it states it shall apply "for a period of one (1) year beginning on the

effective date of [the employee's] termination," and "shall be limited to a 50-mile radius of the

Company's facility located at 2474 Clay Street, Chattanooga, TN . . . as well as a 50-mile radius

of any other locations in which Employee worked."  (Doc. 10-1, at 1.)  While Kasinger contends

the Agreement should be construed strictly under the precedents summarized above, he does not

argue the non-competition provision is categorically unenforceable.  (*See* Doc. 15, at 5–7.)

Kasinger likewise does not argue the 50-mile territorial limitation is unreasonable (*see id.*), and

the Court sees no reason to find it necessarily unreasonable given the facts alleged in the

pleadings.  *See Murfreesboro Med. Clinic*, 166 S.W.3d at 678.  Thus, given that the complaint

---

breach of contract, which is drawn from Count 1 of MRO's complaint, does encompass the full
substance of the claim; accordingly, the Court's analysis focuses on those four theories.

alleges MRO and Kasinger entered into a non-competition agreement with time and territorial limitations that do not appear unreasonable (*see* Doc. 10, at 4–5), the Court finds MRO has sufficiently alleged the existence of a valid and enforceable contract to proceed on this theory. *See Fed. Ins. Co.*, 354 S.W.3d at 291.

However, there is a problem with MRO's allegations as to the breach element. *See id.* Bare conclusory allegations that a defendant has breached a contract are insufficient under the pleading standard. *See Iqbal*, 556 U.S. at 664 ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations."). Although MRO alleges that Kasinger's employment with Automation Hub constituted breach of the Agreement, its complaint does not contain sufficient factual allegations to make the alleged breach plausible—namely because the complaint fails to allege any facts from which the Court could infer that Kasinger's employment with Automation Hub was within the 50-mile territorial limit of the non-competition provision. *See id.*; (Doc. 10). For instance, MRO never alleges specifically that Kasinger accepted competing employment within 50 miles of MRO Arkansas, nor that Automation Hub was located within 50 miles of MRO Arkansas, and it likewise does not provide any specific factual allegations as to where Automation Hub or MRO Arkansas were located *within* Arkansas. (*See* Doc. 10.) However, there is reason to suspect MRO *could* have made such an allegation in the complaint because it represents in its response brief that Kasinger's competing employment was within the 50-mile limit, and specifically that both Automation Hub and MRO Arkansas were located within "the same town" of Rogers, Arkansas, which Kasinger's reply does not dispute.[12] (Doc. 21, at 10; *see* Doc. 23.) Were these geographical representations

---

[12] MRO further states that "[t]he reason that Automation Hub's Rogers address is not in the Second Amended Complaint is simply because Automation Hub had already been served and

included as factual allegations in MRO's complaint, it would have sufficiently alleged the breach element. *See Iqbal*, 556 U.S. at 664. Thus, because the Court does not believe counsel's failure to make a factual allegation that seems to have been readily available should prevent MRO from bringing what, otherwise, appears to be a plausible claim for breach of the non-competition provision, the Court will **ORDER** MRO to amend its complaint as further provided in the Conclusion of this Order. *See* Fed. R. Civ. P. 15(a)(2) (providing a "court should freely give leave [to amend] when justice so requires").

Finally, MRO has sufficiently alleged the third and final element of breach of contract, damages. *See Fed. Ins. Co.*, 354 S.W.3d at 291. What constitutes damages for a breach-of-contract claim may depend in part on what the contract provides regarding the availability of remedies for breach of its terms. *See HCTec Partners, LLC v. Crawford*, 676 S.W.3d 619, 640–41 (Tenn. Ct. App. 2022) (affirming trial court's award of attorneys' fees on a breach-of-contract claim on summary judgment when, despite the plaintiff conceding it had "not suffered any monetary damages," the contract provided that a breach of its terms would entitle the prevailing party to attorney's fees). Here, MRO alleges it is entitled to injunctive relief under the injunctive-relief provision of the Agreement, as well as "reasonable attorney's fees and litigation expenses" under the attorney-fees provision. (Doc. 10, at 6; *see* Doc. 10-1, at 2–3.) Thus, MRO has alleged damages. *See HCTec Partners*, 676 S.W.3d at 640–41.

For these reasons, the Court will **RESERVE** ruling on MRO's breach-of-contract claim to the extent it alleges Kasinger violated the non-competition clause, pending amendment of the complaint.

---

has retained an attorney at the time of filing." (Doc. 21, at 10.) However, the logistics of service and retention of counsel are irrelevant to the pleading standard under Rule 8.

b.     Breach Based on Solicitation of beRobox and Industrial Solutions Authority

Kasinger argues MRO's complaint fails to state a claim based on his alleged solicitations of vendors beRobox and Industrial Solutions Authority because this non-solicitation provision does not encompass solicitations of vendors, and MRO alleges that both beRobox and Industrial Solutions Authority are vendors, not customers. (*See* Doc. 15, at 6–7; Doc. 10, at 9, 17.) MRO responds that "even if the solicitation of those entities did not violate . . . the non-solicitation provisions, it is relevant to the non-competition claim." (Doc. 21, at 10.)

"The literal meaning of the contract language controls if the language is clear and unambiguous." *Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013) (citing *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009)). When "terms are ambiguous in that they are 'susceptible to more than one reasonable interpretation,'" courts should "apply other established rules of construction to aid in determining the contracting parties' intent." *Id.* at 659 (quoting *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006)) (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002)).

Here, the Agreement's non-solicitation clause provides, in relevant part, that for one year of the termination of Kasinger's employment, he may not "[s]olicit, contact, call upon, communicate with, attempt to solicit or communicate with or do business with any customer, former customer or prospective customer of the Company for the purpose of engaging in business competitive with the Company." (Doc. 10-1, at 2.) The plain language of this provision is focused clearly and expressly on customers—it takes pains to include "any customer, former customer or prospective customer" (*id.*); as a result, the Court finds this language clear and unambiguous in that it applies to customers, not vendors. Even if the

22

provision were ambiguous, it could have easily mentioned vendors in addition to customers, and as the *expressio unius* rule of construction provides, " 'the expression of one thing is the exclusion of another (of the same kind).' " *D & E Const. Co., Inc. v. Robert J. Denley Co., Inc.*, 38 S.W.3d 513, 519 (Tenn. 2001) (quoting *City of Knoxville v. Brown*, 260 S.W.2d 264, 268 (1953)). Furthermore, MRO does not allege any facts that might suggest the parties intended for the provision to apply to solicitations of vendors. (*See* Doc. 10.) Thus, the Court finds solicitation of vendors falls outside the scope of the non-solicitation provision. *See Dick Broadcasting*, 395 S.W.3d at 659. As a result, MRO's complaint fails to state a breach-of-contract claim to the extent that claim is premised on Kasinger breaching the non-solicitation provision by soliciting vendors. *See id.* However, MRO is also correct that its factual allegations regarding Kasinger's solicitation of vendors may be relevant to its claim that he breached the non-competition agreement, and nothing in this Order precludes MRO from making such an argument at later stages of this litigation.

c.     Breach Based on Solicitation of Gexpro

The same reasoning does not apply to MRO's allegations regarding Kasinger's solicitation of Gexpro, because the complaint alleges Gexpro is "one of MRO's customers." (Doc. 10, at 14.) Kasinger argues that MRO fails to state a breach-of-contract claim on this ground because the complaint "fails to establish that Gexpro's geographic location lies within the 50-mile radius . . . [of] the Kasinger Agreement," and that the complaint therefore fails to allege he "breached the noncompetition and/or non-solicitation provisions." (Doc. 15, at 7.) However, there is a crucial difference between the non-competition and non-solicitations provisions here: while the non-competition provision includes the 50-mile term, the non-solicitation provision includes no express territorial limits. (*See* Doc. 10-1, at 1–2.) This distinction is made clear in

the plain text of the Agreement, as paragraph "(b)" of the non-competition clause—the paragraph that restricts Kasinger's conduct within one year of his termination—provides, "[t]he restrictions in *this paragraph* shall be limited to a 50-mile radius . . . of any other locations in which Employee worked." (*Id.* at 1 (emphasis added).)  Given that, in contrast, the non-solicitation provision contains the same one-year term but no territorial limit (*see id.* at 1–2), the Court doubts its omission of a similar 50-mile term is accidental, and Tennessee law generally seeks to give effect to the intentions of contracting parties. *See Dick Broadcasting*, 395 S.W.3d at 659.

There is some precedent suggesting Tennessee law views non-solicitation clauses with some skepticism, as it does all restrictive covenants that might restrain commerce. *See Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 32–33 (Tenn. 1984)).  Tennessee courts apply a "rule of reasonableness" to restrictive covenants, which "provides that unless the circumstances indicate bad faith on the part of the employer, a court will enforce covenants not to compete to the extent that they are reasonably necessary to protect the employer's interest 'without imposing undue hardship on the employee when the public interest is not adversely affected.'"  *Id.* at 37 (explaining that this rule came into favor in place of the old "blue pencil" approach to striking unenforceable portions of restrictive covenants); *see Hanger Prosthetics & Orthotics East, Inc. v. Kitchens*, 280 S.W.3d 192, 196 (Tenn. Ct. App. 2008) (applying rule of reasonableness and citing *Central Adjustment Bureau*).  However, this approach does not mean that non-solicitation clauses must contain the same kind of territorial limits as non-competition clauses to be enforceable, and the Court is not convinced at present that it would be unreasonable as a matter of law to apply this non-solicitation provision to Kasinger's alleged solicitation of Gexpro. *See Central Adjustment Bureau*, 678 S.W.2d at 37.  MRO has therefore plausibly

alleged the existence of an enforceable non-solicitation clause.[13]  *See Fed. Ins. Co.*, 354 S.W.3d at 291.  The complaint also contains detailed factual allegations sufficient for breach, including that Kasinger used his Automation Hub email address to contact a Gexpro representative on May 3, 2024, and that this email "sought Gexpro's business to purchase equipment from Automation Hub." (Doc. 10, at 14.)  It has also alleged damages pursuant to the Agreement's provisions for judicial remedies.  *See HCTec Partners*, 676 S.W.3d at 640–41; (Doc. 10-1, at 2–3).  Thus, MRO has stated a claim for breach of the non-solicitation clause with respect to Kasinger's alleged solicitation of Gexpro.  *See Fed. Ins. Co.*, 354 S.W.3d at 291.

> d.  <u>Whether MRO States a Claim for a Declaratory Judgment</u>

MRO seeks a declaration (1) that the Agreement's restrictive covenants are reasonable and enforceable; and (2) "establishing the proper extension" of the Agreement's tolling provision (Doc. 10, at 19), which provides that in the event of breach of the non-competition or non-solicitation clauses, "the period of restraint shall automatically toll and extend the restraint during the period that the breach continues" (Doc. 10-1, at 2).  Kasinger argues the Court should dismiss MRO's request for a declaratory judgment because it fails to state a claim for breach of contract.  (*See* Doc. 15, at 8; Doc. 23, at 5.)  However, for the reasons explained above, MRO's complaint does state a claim for breach of contract given that, notwithstanding the current deficiencies of the complaint with respect to the 50-mile term of the non-competition provision, MRO has at minimum stated a claim for breach of the non-solicitation provision.  Thus, the Court will not grant dismissal on this ground.

---

[13] Nothing in this Order prevents Kasinger from contesting the reasonableness of the non-solicitation provision at a later stage of this litigation.

### ii.    Misappropriation of Trade Secrets Under TUTSA and DTSA

MRO alleges Kasinger misappropriated trade secrets in violation of TUTSA and DTSA. (*See* Doc. 10, at 22–26.)  Claims under the DTSA and the TUTSA have "largely the same" elements, as well as similar definitions of the relevant terms.  *BNA Assocs., LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, No. 3:21-cv-00481, 2022 WL 1449707, at *4 (M.D. Tenn. May 9, 2022) (quoting *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, No. 3:19-CV-00966, 2019 WL 5964531, at *5 (M.D. Tenn. Nov. 13, 2019)).  The DTSA defines trade secrets as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes" and protects owners who have "taken reasonable measures to keep secret, and which derives independent economic value from that secrecy."  18 U.S.C. § 1839(3); *B&P Littleford, LLC v. Prescott Machinery, LLC*, No. 20-1449/1451, 2021 WL 3732313, at *5 (6th Cir. Aug. 24, 2021).  The TUTSA similarly defines "trade secret" as

> information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
>
> > (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> >
> > (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4).  Both the TUTSA and the DTSA treat the use of a trade secret by a person who knew or had reason to know that the trade secret had been acquired by improper means as misappropriation.  *See* 18 U.S.C. § 1839(5)–(6); Tenn. Code Ann. § 47-25-1702(1)–(2).  Based on these statutory frameworks, "the elements for a misappropriation of trade

secrets claim are:  (1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff."  *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 2006 WL 2370338, at *3 (E.D. Tenn. Aug. 15, 2006) (citations omitted), *aff'd*, 246 F. App'x 969 (6th Cir. 2007).

Here, the Court need reach only the first element, because MRO's complaint fails to allege the existence of a trade secret.  *See PartyLite Gifts*, 2006 WL 2370338, at *3.  At the outset, the Court notes that conclusory allegations as to the existence of trade secrets are insufficient under the pleading standard.  *See Iqbal*, 556 U.S. at 664; *see also Allergan, Inc. v. Revance Therapeutics, Inc.*, 711 F. Supp. 3d 873, 879 n. 5 (M.D. Tenn. 2024) ("the Court is not required to accept as true that what Plaintiff calls [its alleged trade secrets] indeed qualify as trade secrets in whole or in part under relevant law from a mere assertion by Plaintiff that these items are 'trade secrets'").  To plausibly allege the existence of a trade secret, rather, a complaint must not only "assert[] that certain items qualify as trade secrets" but "*support*[] that assertion with factual matter relating to the criteria used to define trade secrets under the DTSA and TUTSA."  *Allergan*, 711 F. Supp. 3d at 879 n. 5 (emphasis added).

MRO alleges it "utilizes trade secret information in its business, and such trade secrets include, but are not necessarily limited to, its customer lists, vendor lists, pricing structure for the products sold and services offered by MRO, and sales strategies tailored to customer needs and buying habits and patterns."  (Doc. 10, at 22.)  In its response brief, MRO argues that this allegation is self-evidently sufficient, stating that "customer lists, vendors lists, pricing structures, and sales strategies [are] exactly the kind[s] of business information that courts regularly recognize as trade secrets" (Doc. 21, at 13 (cleaned up) (citing *RGIS, LLC v. Gerdes*, 817 F. App'x 158, 162 (6th Cir. 2020))), and that the pleading standard does not require it "to

identify 'trade secrets down to the finest detail'" (Doc. 21, at 12 (citing *360 Mortg. Grp., LLC v. Stonegate Mortg. Corp.*, 2016 WL 4943933, *114 (E.D.N.C. Sept. 14, 2026))).  But the allegation quoted above fails to provide *any* detail.  It does little, if anything, more than list generic *categories* of trade secrets (customer lists, vendor lists, pricing structures, sales strategies), while neglecting to elaborate on what those alleged trade secrets are, let alone supporting them with factual allegations "relating to the criteria used to define trade secrets under the DTSA and TUTSA."  *Allergan*, 711 F. Supp. 3d at 879 n. 5.  In this respect, MRO's observation that this allegation consists of "the *kind[s]* of business information that courts regularly recognize as trade secrets" betrays its inadequacy.  (Doc. 21, at 13 (emphasis added).)

MRO then argues that it sufficiently alleges reasonable measures to protect its trade secrets by virtue of the inclusion in the Agreement, which Kasinger allegedly executed, of a provision prohibiting him "from using or disclosing the company's 'confidential and proprietary information.'"  (Doc. 21, at 15 (citing Doc. 10, at 4–6).)  MRO cites a single non-binding case in support of its proposition that the execution of a confidentiality agreement as a condition of employment constitutes reasonable measures to maintain the secrecy of a trade secret:  *Best Process Solutions, Inc. v. Blue Phoenix Inashco USA, Inc.*, 569 F. Supp. 3d 702 (N.D. Ohio 2021).  (*See* Doc. 21, at 14–15 (citing *Best Process Solutions*, 569 F. Supp. 3d at 714).) However, while the *Best Process Solutions* court indeed found Best Process Solutions, Inc. ("BPS") "plausibly allege[d] the existence of a trade secret," 560 F. Supp. 3d at 714, that case is plainly distinguishable from the instant case in at least two key respects:  First, it involved specific, substantive factual allegations as to what the trade secret was—BPS alleged "the 'internal workings' of BPS's RecoverMax system, including the components necessary to install the system in a facility,' constitute[d] trade secrets," and as the court noted, "BPS expressly

allege[d] that information regarding the technical design and components of its RecoverMax system is confidential and proprietary."[14] *Best Process Solutions*, 569 F. Supp. 3d at 713 (citing the record). Second, far from the employer–former-employee dispute before the Court, *Best Process Solutions* was a dispute between two metal-processing entities who executed a non-disclosure agreement when the defendant ("Inashco") became interested in BPS's RecoverMax system, and BPS alleged that "it took precautions to safeguard the secrecy of this information by requiring Inashco to sign the NDA before allowing Inashco access to it." *Id.*; *see id.* at 704. This discussion of *Best Process Solutions* should make the insufficiencies of MRO's allegations clear: an NDA executed for the purpose of facilitating access to a specific, identified piece of information is distinct from a confidentiality agreement executed to protect seemingly any and all confidential or proprietary information an employee might encounter over the course of employment, and the confidentiality provision in the Agreement here cannot, by itself, transform MRO's vague and conclusory references to trade secrets into plausible allegations. *See id.* at 713; *Iqbal*, 556 U.S. at 664.

Although MRO's response brief neglects to elaborate meaningfully on its alleged trade secrets, there are allegations in the complaint that are somewhat more specific regarding two pieces of information to which Kasinger had access while at MRO Arkansas: (1) the professional email address of a Gexpro representative, which MRO alleges was not publicly available, and (2) an "email template" MRO alleges Kasinger used to solicit this representative

---

[14] Note also that these allegations, which involve technical designs and component parts used for a specific purpose, are the sort of specific factual allegations from which a court could infer that the information derives economic value from not being known (the first element of a trade secret). *See* Tenn. Code Ann. § 47-25-1702(4). Allegations that make only vague references to trade secrets, such the MRO allegation discussed in the previous paragraph, will also tend to be insufficient on this ground. *See Iqbal*, 556 U.S. at 664.

on two separate occasions.  (*See* Doc. 10, at 16.)  But neither of these is sufficient to allege the existence of a trade secret.

While customer lists can constitute trade secrets, *see*, *e.g.*, *Campfield v. Safelife Grp., Inc.*, 91 F.4th 401, 414 (6th Cir. 2024), the Court is aware of no precedent suggesting a single email address, even if not publicly available, can be a trade secret.  MRO does not allege the Gexpro representative's email address was part of a customer list.  (*See* Doc. 10, at 16.)  Even if the Court were to infer the email address were part of the one of "customer lists" to which MRO refers generally later in the complaint (an inference the Court is not convinced is warranted given that the reference to customer lists is wholly separate from the specific allegations about Gexpro), MRO would also need to allege measures it took to keep such a customer list secret, which the complaint fails to do.  *See Knox Trailers, Inc. v. Maples*, 581 F. Supp. 3d 1000, 1013 (E.D. Tenn. 2022).  Thus, MRO's allegation that Kasinger used this email address is insufficient.

As to the emails Kasinger allegedly sent to this representative, MRO alleges, "upon information and belief, the formatting of Kasinger's business solicitation emails to Gexpro . . . utilized an MRO design template that Kasinger had access to during his employment at MRO." (Doc. 10, at 16.)  It further alleges that his use of the template to solicit Gexpro "evidences the email template design's independent economic value."  (*Id.* at 23.)  Yet "[t]o constitute a trade secret, it must be difficult for anyone outside the confidential relationship to acquire the information by proper means."  *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001).  Or, as TUTSA's definition puts it, a trade secret must derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons."  Tenn. Code Ann. § 47-25-1702(4).  When information may be easily reverse engineered, therefore, it is likely not a trade secret.  *See*

*Allergan*, 711 F. Supp. 3d at 897–98 (explaining that reverse engineerability typically suggests information is not a trade secret under TUTSA *unless* "reverse engineering it 'would be expensive, difficult, time-consuming, impracticable, or for any other reason not a reasonably desirable option'") (quoting *Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808, 821 (E.D. Tenn. 2005)).

Here, MRO's allegations regarding the email template suggest it is exactly the kind of information that can be reverse engineered and, thus, cannot constitute a trade secret. *See* Tenn. Code Ann. § 47-25-1702(4); *Allergan*, 711 F. Supp. 3d at 897–98. An email template is essentially a series of formatting choices—fonts, sizes, bolding or italics, etc.—and many a typical white-collar or administrative professional who deals regularly with word-processing software would be able to examine an email and ascertain its formatting. Even inferring, as the Court does here, that Kasinger's emails to Gexpro replicated the formatting of MRO solicitation emails, MRO's complaint fails to allege he used any information that was not readily ascertainable. *See* Tenn. Code Ann. § 47-25-1702(4). Thus, Kasinger's alleged use of an MRO email template is insufficient to state a claim under TUTSA or DTSA that he misappropriated MRO's trade secrets. *See id.*

### iii.    *Common Law Tort Claims*

MRO brings claims for intentional interference with business relations and civil conspiracy. (*See* Doc. 10, at 28–29, 30–31.) As a preliminary matter, Kasinger argues these claims are preempted under TUTSA, which preempts common law tort claims "providing civil remedies for misappropriation of a trade secret." Tenn. Code Ann. § 47-25-1708; (*see* Doc. 15, at 11–12.) This provision has "generally been interpreted to abolish all free-standing alternative causes of action for theft or misuse of confidential, proprietary, or otherwise secret information

falling short of trade secret status." *Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649, 655 (E.D. Tenn. 2004); *see also PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 976 (6th Cir. 2007) (citing *Hauck*). To determine when a tort claim is preempted, courts use the "same proof" test: "if proof of a non-[T]UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective of whatever surplus elements of proof were necessary to establish it." *Hauck Mfg.*, 375 F. Supp. 2d at 658.

The Court is not convinced TUTSA preemption should apply here given that MRO's allegations regarding Kasinger's use of an email address and email template cannot satisfy the definition of a trade secret under TUTSA. *See* Tenn. Code Ann. § 47-25-1702(4). That is, to the extent MRO's common law tort claims overlap with its allegations regarding the email template, it is not clear that preemption would apply because the evidence that would substantiate those allegations, even if produced, could not "simultaneously establish a claim for misappropriation of trade secrets." *See Hauck Mfg.*, 375 F. Supp. 2d at 658. However, the Court need not decide this issue because MRO's common law tort claims fail to state a claim on their own terms.

a. Intentional Interference with Business Relations

To state a claim for intentional interference with business relations, a plaintiff must plead facts sufficient to allege five elements: (1) the plaintiff had an existing or prospective business relationship with a third party, (2) the defendant had knowledge of that relationship, (3) the defendant intended to cause a breach or termination of that relationship, (4) the defendant acted with improper motive or improper means, and (5) damages as a result of the tortious interference. *See BNA Associates LLC v. Goldman Sachs Specialty Lending Group, L.P.*, 63 F.4th 1061, 1063–64 (6th Cir. 2023) (citing *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)). MRO sufficiently alleges three of these five elements: It alleges it had

existing business relationships with beRobox, Gexpro, and Industrial Solutions Authority (the first element). (*See* Doc. 10, at 9, 14, 17.) It alleges Kasinger had knowledge of MRO's relationships with beRobx and Gexpro (the second element). (*See id.* at 9, 16.) MRO also alleges Kasinger acted with improper motive or means insofar as he relied on information he learned through his employment with MRO Arkansas to solicit business from beRobox and Gexpro (the fourth element). (*See id.*)

However, MRO's complaint does not sufficiently allege either damages (the fifth element) or intent to cause a breach or termination (the third element). *See BNA Associates*, 63 F.4th at 1063–64. To plead the damages element, a plaintiff must allege it has experienced some kind of economic loss or hardship as a result of the defendant's tortious conduct. *See Testerman v. Tragesser*, 789 S.W.2d 553, 556–57 (Tenn. Ct. App. 1989) (affirming dismissal of an intentional interference with business relations claim when plaintiff obtained fair-market value for a sale of property and therefore "suffered no damages" as a result of the alleged tortious interference); *see also Stratienko v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 435 S.W.3d 189, 202 (Tenn. Ct. App. 2013) (affirming entry of judgment as a matter of law for defendant when, inter alia, there was "no proof of damage" and, on the contrary, the evidenced showed that "[plaintiff's] business had actually performed better financially, in some instances, than previously before"). MRO's damages allegations are conclusory at best: "MRO has been harmed, and is continuing to be harmed, by Defendants' intentional interference through solicitation of customers and vendors"; "MRO has been damaged, and is continuing to be damaged, by Defendants' intentional interference with these relationships." (Doc. 10, at 28.) Rule 8's pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). MRO never

33

elaborates on *how* Kasinger's alleged tortious interference harmed it, and its allegations are altogether insufficient to plead damages. *See BNA Associates*, 63 F.4th at 1063–64.

Consider what the complaint *does not allege* as to damages resulting from Kasinger's solicitations: Most obviously, MRO never alleges that it has lost any business or otherwise suffered any specific economic harm, and the Court sees no grounds to infer any such harm. (*See* Doc. 10, at 9–17, 28–29.) Nor does MRO allege that Automation Hub actually secured business relationships with beRobox, Gexpro, or Industrial Solutions Authority as a result of Kasinger's alleged tortious interference. (*See id.*) MRO's most robust allegation as to the effects of Kasinger's solicitations pertains to beRobox—specifically, its allegation that Kasinger and Darter posted on social media about a beRobox demonstration at Automation Hub's offices; but given that beRobox is a vendor, there is no reason to believe beRobox could not contract with both MRO *and* Automation Hub even if this demonstration did lead to a contract. (*See id.* at 9, 12.) MRO makes no allegations from which the Court could infer Kasinger's alleged solicitations received any kind of response from the other vendor, Industrial Solutions Authority, or from MRO's customer, Gexpro. (*See id.* at 14–17.) Thus, MRO has not alleged damages, which alone warrants dismissal.

This lack of allegations as to damages, furthermore, throws into relief the complaint's insufficiencies as to the element of intent to cause a breach or termination. *See BNA Associates*, 63 F.4th at 1063–64. In some circumstances, when a cause of action involves a scienter element, a court may infer from other factual allegations an allegation of intent sufficient to survive a motion to dismiss; not so here. *See Iqbal*, 556 U.S. at 683 (discussing how complaint allegations "could be the basis for some inference of wrongful intent"); *Snir v. Am.'s Collectibles Network, Inc.*, 2010 WL 2389314, at *8 (E.D. Tenn. June 8, 2010). Just as it is unclear that Automation

Hub securing a vendor contract with beRobox would affect MRO's relationship with beRobox, it is unclear how Kasinger's alleged solicitations of Industrial Solutions Authority could affect MRO's relationship with that vendor. *See Snir*, 2010 WL 2389314, at *8. Even for the only customer allegedly solicited—Gexpro—it is not clear that Gexpro's becoming a customer of Automation Hub would have impacted MRO's relationship with Gexpro, because the complaint contains no allegations about what *MRO* sold to Gexpro.[15] (*See* Doc. 10, at 14–17.) In the absence of such allegations, and thus with no means to compare the sales offerings of Automation Hub and MRO, the Court cannot infer that Gexpro's becoming a customer of Automation Hub would have posed any threat to its customer relationship with MRO. *See BNA Associates*, 63 F.4th at 1063–64. Thus, without allegations sufficient to make plausible a causal connection between Kasinger's conduct and a likely breach or termination of MRO's business relationships with beRobox, Industrial Solutions Authority, or Gexpro, the Court cannot infer that he intended to cause such a breach or termination. *See Iqbal*, 556 U.S. at 683. Given this issue and the lack of damages allegations, MRO has failed to state a claim for intentional interference with business relations.

b. <u>Civil Conspiracy</u>

Civil conspiracy requires (1) a common design between two or more persons, (2) an unlawful purpose or means, (3) an overt act in furtherance of the conspiracy, and (4) injury to person or property resulting in attendant damage. *See Menuskin v. Williams*, 145 F.3d 755, 770

---

[15] Though the complaint contains screenshots of Kasinger's alleged solicitation emails to Gexpro that appear to enumerate Automation Hub's offerings (including "PLC's, HMI's, VFD's, Circuit Boards, Touchscreens, Servo Motors, & Much More," as well as a list of "Popular Brands that we stock and repair"), MRO makes no allegations about either its sales offerings in general or what it sold to Gexpro in particular. The complaint is largely silent on the nature and scope of MRO's business. (*See generally* Doc. 10.)

(6th Cir. 1998) (citing *Braswell v. Carothers*, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993)).  In addition, "[a] claim for civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy.  Conspiracy, standing alone, is not actionable where the underlying tort is not actionable."  *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) (internal citations and quotations omitted); *see also Hauck Mfg.*, 375 F. Supp. 2d at 660; *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007).  Here, the Court need not consider MRO's civil conspiracy allegations because its complaint fails to state a claim for any other tort, meaning it lacks "an underlying predicate tort allegedly committed pursuant to the conspiracy."  *Lane*, 334 S.W.3d at 763.  For this reason alone, the complaint fails to state a claim for civil conspiracy against Kasinger.

## IV.        CONCLUSION

The Court hereby **GRANTS** Wilson and Automation Hub's motion to dismiss for lack of personal jurisdiction (Doc. 12).  As to Kasinger's motion to dismiss for failure to state a claim (Doc. 14), the Court hereby (1) **RESERVES IN PART** the motion to the extent the complaint alleges breach of contract based on breach of the non-competition clause; (2) **GRANTS IN PART** the motion as to MRO's claims for misappropriation of trade secrets claims under TUTSA and DTSA, intentional interference with business relations, civil conspiracy, and breach of contract to the extent it is based on breach of the non-solicitation clause with respect to solicitation of vendors; and (3) **DENIES IN PART** the motion as to the breach-of-contract claim to the extent it is based on breach of the non-solicitation clause with respect to the Gexpro solicitation, and as to the claim for a declaratory judgment regarding Kasinger's contract.

Furthermore, to cure the pleading deficiency that leads the Court to reserve ruling on the breach-of-contract claim in part, the Court hereby **ORDERS** MRO to amend its complaint to the

extent necessary to allege that Automation Hub is within 50 miles of the location of MRO

Arkansas.  MRO is **ORDERED** to file this amended complaint, or to show cause as to why it

cannot, on or before **May 9, 2025**.

      **SO ORDERED.**

                                          ***/s/ Travis R. McDonough***

                                          **TRAVIS R. MCDONOUGH**
                                          **UNITED STATES DISTRICT JUDGE**