UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| MANUFACTURING REPAIR & OVERSTOCK, INC., | ) ) ) Case No. 1:24-cv-268 |
| Plaintiff, | ) ) Judge Travis R. McDonough |
| v. | ) ) Magistrate Judge Michael J. Dumitru |
| CALEB KASINGER, | ) ) |
| Defendant. | ) |

# MEMORANDUM OPINION

Before the Court is Plaintiff Manufacturing Repair & Overstock, Inc.'s motion for a preliminary injunction (Doc. 44).[1] For the following reasons, the Court will **DENY** the motion.

## I. BACKGROUND

### A. Factual Background

Manufacturing Repair & Overstock, Inc. ("MRO") is a corporation based in Chattanooga, Tennessee. (*See* Doc. 45-1, at 1.) According to CEO Russell Looper,[2] who co-founded MRO with former-defendant Justin Wilson,[3] MRO specializes in "the repair of industrial machinery

---

[1] MRO's motion is styled specifically as one to "convert" a temporary restraining order ("TRO"), which was issued by a Tennessee state court prior to the removal of this litigation, into a preliminary injunction. (*Id.* at 1.) The Court construes the motion as seeking a preliminary injunction generally—regardless of whether there is any connection between that injunction and the state-court issued TRO.

[2] Many of MRO's factual representations cite to Looper's affidavit (*see* Doc. 45, at 3–12), and Kasinger does not dispute the facts therein.

[3] MRO's claims against Wilson were dismissed for lack of personal jurisdiction on April 25, 2025. (Doc. 46.)

and sales of new and used industrial machinery and parts across the board in manufacturing sectors." (*Id.*) MRO's business also includes a "robotics division providing robots that serve various roles in manufacturing" and "are designed to safely work in . . . tandem with their human counterparts and improve manufacturing efficiency." (*Id.* at 2.) Particularly relevant here is a robotics system known as "Paltz," which MRO represents was created by one of its vendors, beRobox, and "assists customers with stacking and securing goods into a pallet for efficient handling, transportation, and storage." (Doc. 45, at 4; *see* Doc. 45-1, at 2.)

This dispute centers on alleged violations of a contract executed between MRO and its former employee, Defendant Caleb Kasinger. According to Looper, Kasinger began working for MRO in Summer 2019 as an intern at its Arkansas office ("MRO Arkansas"). On the first day of his internship, June 13, 2019, Kasinger and MRO executed an agreement titled, "NONCOMPETITION AND NON-SOLICITATION AGREEMENT" (the "Agreement"). (Doc. 45-3.) The Agreement provides, in relevant parts, the following [4]:

> WHEREAS, Employee desires to be employed, or to continue to be employed, by the Company as *Caleb Kasinger*,[5] and the Company desires to continue to employ Employee in that position; and
>
> WHEREAS, Employee acknowledges and agrees that as a result of Employee's position with the Company, Employee will be provided: (i) access to confidential and proprietary Company information, including trade secrets; (ii) specialized training; and (iii) the opportunity to develop relationships with Company customers due to the Company's investment in Employee, through training or otherwise, as well as the confidential and proprietary information provided to Employee by the Company. As a result, Employee acknowledges and agrees that engaging in business competitive with the Company would cause the Company irreparable harm . . .

---

[4] Kasinger does not dispute that these representations of the Agreement are accurate.

[5] Kasinger's name appears handwritten on a blank line on the Agreement that appears intended for the relevant job title. (*See* Doc. 45-3, at 1.)

2. <u>Non-Competition</u>.

    (a) Employee agrees that, during Employee's employment with the Company, Employee will not engage in, on Employee's own behalf or on behalf of or with any other person, firm, corporation or other entity (except for and on behalf of the Company), directly or indirectly, the sale of products or services competitive with the products or services the Company currently markets and/or sells.

    (b) Upon Employee's termination of employment with the Company for any reason, Employee agrees not to engage in, on Employee's own behalf or on behalf of or with any other person, firm, corporation or other entity, directly or indirectly, the marketing and/or sale of products or services the Company currently markets and/or sells, for a period of one (1) year beginning on the effective date of his/her termination. The restrictions in this paragraph shall be limited to a 50-mile radius of the Company's facility located at 2474 Clay Street, Chattanooga, TN 37406, as well as the following counties: (i) Davidson, Rutherford, Knox and Dyer counties, Tennessee; (ii) Gwinnett, Cobb, Forsyth, Dawson and Floyd counties, Georgia; as well as a 50-mile radius of any other locations in which Employee worked or to which Employee directed marketing, sales, or service activities during the one-year period preceding the date of Employee's termination.

3. <u>Non-Solicitation</u>. Employee further agrees not to, directly or indirectly, during Employee's employment with the Company and for a period of one (1) year thereafter:

    . . . (b) Solicit, contact, call upon, communicate with, attempt to solicit or communicate with or do business with any customer, former customer or prospective customer of the Company for the purpose of engaging in business competitive with the Company . . .

4. <u>Confidential and Proprietary Information</u>. Employee acknowledges that Employee has, and will continue to have, possession of confidential and proprietary information and knowledge as to the Company's business and its customers, including, but not limited to, knowledge of the Company's products and services, customer lists and records, customer preferences, information regarding sales, costs, pricing, marketing, contracts with third parties, computer programs, business and strategic plans, financial forecasts, data (including cost data), methods, customer uses and requirements, inventions and copyrights, as well as other information that derives economic value, directly or indirectly, from being confidential or proprietary to or trade secrets of the Company ("Confidential Information"). . . . Employee agrees that such Confidential Information is and shall remain the Company's property and that, upon termination of employment, Employee will not use or disclose or cause to be

disclosed any Confidential Information to any third person, partnership, joint venture, company, corporation, other business organization or other third party. . .

6.  <u>Extension of Covenants in the Event of Breach</u>.  In the event Employee breaches the covenants expressed in Sections 2 and 3 above, the period of restraint shall automatically toll and extend the restraint during the period that the breach continues. . . .

9.  <u>Governing Law; Exclusive Jurisdiction and Venue</u>.  This Agreement shall be construed and enforced in accordance with the laws of the State of Tennessee. The parties agree that any proceeding or action brought by either party, or anyone on behalf of either party, under or in relation to this Agreement, including without limitation to interpret or enforce any provision of this Agreement, shall be brought exclusively in, and each party agrees to and does hereby submit to the jurisdiction and venue of, any state or federal court in Hamilton County, Tennessee. . . .

12.  <u>Entire Agreement; Amendment</u>.  This Agreement represents the entire agreement between Employee and the Company with respect to the subject matter hereof, superseding all previous oral or written communications, representations, or agreements.  This Agreement may be modified or terminated only by a written agreement signed by both parties. . . .

(*Id.* at 1–3.)

Kasinger's internship concluded on July 19, 2019.  (*See* Doc. 45-1, at 2.)  Subsequently, on February 27, 2020, he began working full-time at MRO Arkansas as an account manager. (*See id.*)  The record does not indicate that MRO and Kasinger either amended the Agreement or executed a new one when Kasinger was hired full time.  In Kasinger's new role as an account manager, according to Looper, "Kasinger became intimately involved with MRO's robotics department while working with Wilson."  (*Id.* at 3.)  In January 2023, when Wilson left the company and started former-defendant Automation Hub, Kasinger was promoted to Branch Manager for MRO Arkansas and head of robotics at MRO overall.  (*See id.*)  While Kasinger was in this role, Looper states, he "was heavily involved in every potential MRO robotics deal and assisted in developing MRO's marketing strategies, business plans, and managing MRO's

growing robotics' [sic] market share." (*Id.*)  In February 2024, Kasinger resigned from MRO and subsequently began working for Automation Hub.  (*See id.* at 4; Doc. 51-1, at 1.)

MRO represents, and Kasinger does not dispute, that "Automation Hub is a direct competitor with MRO":  "Automation Hub specializes in industrial repairs just like MRO," and, like MRO, it "also sells robots to assist in manufacturing," including the Paltz palletizing robot.  (Doc. 45, at 10.)  Both are located in Rogers, Arkansas.  (*See id.* at 11.)  Once Kasinger joined Automation Hub, MRO contends he began contacting some of its customers and vendors.  (*See id.* at 11–12.)  The record includes copies of what appear to be business-solicitation emails sent by Kasinger in May 2024 to a representative of MRO-customer Gexpro.  (*See* Doc. 45-5.)  In addition, MRO represents, and Kasinger does not dispute, that he contacted MRO vendors beRobox and Industrial Solutions Authority.  (*See* Doc. 45, at 11–12.[6])

Kasinger represents, and MRO does not dispute, that he was in the process of relocating around the time he began working for Automation Hub.  (*See* Doc. 51-1, at 1.)  When he was working for MRO, Kasinger resided in Rogers, Arkansas, where both MRO Arkansas and Automation Hub are located.  (*See id.*)  But in May 2024, he "began transitioning to Hot Springs, Arkansas, and was periodically working remotely for Automation Hub in Hot Springs."  (*Id.*)  Then, in August 2024, he and his family moved into a house in Benton Arkansas, which is located approximately 225 miles from Rogers, and he has worked remotely from Benton since then.  (*See id.* at 1–2.)

---

[6] Though Kasinger does not dispute that these contacts took place, MRO has not submitted any evidence documenting them specifically.

5

### B. Procedural History

MRO filed its original complaint in state court on May 3, 2024, against Kasinger and former-defendant (and another former employee of MRO) Scott Darter. (*See* Doc. 37, at 1.) On the same day, MRO moved for, and the state court granted, a temporary restraining order (the "TRO"). (*See id.*) The TRO provides, inter alia, that "Defendants [Kasinger and Darter] . . . and all other persons acting in concert with the Defendants" are (1) restrained from contacting MRO employees to solicit any current MRO employee to work at Defendant's current employer, Automation Hub; and (2) "enjoined and restrained from contacting clients, customers, vendors and suppliers of MRO with the intent to induce any current client or customer of MTO to do business with Automation Hub or not do business with MRO." (Doc. 45-2, at 71–72.) The TRO does not provide an expiration date. (*See id.*) On July 8, 2024, MRO amended its complaint, adding Wilson and Automation Hub as defendants, after which they removed this action to this Court. (*See* Doc. 37, at 2.)

MRO filed its second amended complaint on September 24, 2024. (*See* Doc. 10.) All defendants then moved to dismiss the amended complaint: (1) Wilson and Automation hub moved jointly to dismiss under Rules 12(b)(2) and 12(b)(6) (Doc. 12); and (2) Kasinger and Darter moved jointly to dismiss under Rule 12(b)(6) (Doc. 14).[7] Then on December 23, 2024, while the motions to dismiss were pending, Wilson and Automation Hub filed a motion to confirm the state-court issued TRO was not binding on them or, alternatively, that it had automatically expired. (*See* Docs. 31, 32.) The Court denied that motion, finding that (1) the TRO is binding on Wilson and Automation Hub to the extent it bars them from acting in concert

---

[7] While these motions were pending, on March 31, 2025, MRO and Darter filed a joint motion to dismiss the claims against him (Doc. 42), which the Court granted (Doc. 43).

with Kasinger and Darter to violate the TRO; and (2) it has not automatically expired, because it did not expire while in state court under either its terms or the Tennessee Rules of Civil Procedure and, once removed to federal court, 28 U.S.C. § 1450 preserves the TRO as it existed under state law until the Court issues an order dissolving or modifying it. (Doc. 37.)

On April 23, 2025, MRO filed this motion for a preliminary injunction (Doc. 44). Two days later, on April 25, 2025, the Court issued an order on the motions to dismiss (Doc. 46), in which it (1) granted Wilson and Automation Hub's motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction (without reaching their Rule 12(b)(6) motion); and (2) granted in part and denied in part Kasinger's motion to dismiss under Rule 12(b)(6) for failure to state a claim. As of the Court's April 25 order on Kasinger's motion, two claims for relief remain pending against him: a breach-of-contract claim and a corresponding declaratory-judgment claim. (*See id.* at 36–37.)

In the motion now before the Court, MRO seeks a preliminary injunction consisting of the following relief against Kasinger[8]:

1. An injunction enjoining Kasinger "from directly or indirectly, (i) being an employee of, owning, managing, operating, controlling, or participating in the sale or repair of manufacturing and/or industrial equipment or other business that is in competition with the business conducted by MRO in any Geographic Region (defined herein); or (ii) soliciting the customers of MRO for business on behalf of any entity or person other than MRO. The 'Geographic Region' shall be defined as 1) a 50-mile radius of MRO's facility located at 4122 South Creek Road, Chattanooga, Tennessee 37405 and/or within a 50-mile radius of MRO's facility 5417 Pinnacle Point Drive #403, Rogers, Arkansas 72758, and/or 2) in Davidson,

---

[8] As a result of MRO's filing this motion shortly before the Court issued its order on the motions to dismiss, MRO's motion and its brief in support thereof both include references to defendants and claims that have since been dismissed. (*See* Docs. 44, 45, 46.) MRO did not seek to refile or amend its motion as a result; instead, both parties submitted their remaining briefs (Kasinger's response and MRO's reply) to address only the claims that remain against Kasinger. (*See* Docs. 51, 54.) Thus, the Court likewise considers the present motion for a preliminary injunction insofar as it pertains to the remaining claims in this litigation.

>     Rutherford, Knox, and Dyer counties in Tennessee, Gwinnett, Cobb, Forsyth, Dawson, and Floyd counties in Georgia."
>
> 2. An injunction enjoining Kasinger "from directly or indirectly, soliciting for employment by any person or entity other than MRO and its subsidiaries any person employed by MRO and/or its subsidiaries."
>
> 3. An injunction enjoining Kasinger "from directly or indirectly, taking any action which might divert from MRO or any of its subsidiaries any opportunity which would be within the scope of any of the present businesses of MRO or any business proposed or contemplated to be in engaged in by MRO while Kasinger was employed by MRO."

(Doc. 44.)[9]  The motion is now ripe for review.

## II.     STANDARD OF LAW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  The Court considers the following factors when evaluating a motion for preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits;
> (2) whether the movant would suffer irreparable injury without the injunction;
> (3) whether issuance of the injunction would cause substantial harm to others; and
> (4) whether the public interest would be served by the issuance of the injunction.

*Id.* at 542 (citations omitted).

The Sixth Circuit has noted that courts need not "make specific findings concerning each of the four factors . . . if fewer factors are dispositive of the issue."  *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (citations omitted).  However, "it is

---

[9] These requested injunctions are consistent with, but far from identical to, those in the state-court-issued TRO.  (*See* Doc. 45-2, at 71–72.)  As noted previously, while MRO styles this motion as one to "convert" the state-court TRO to a preliminary injunction, the Court construes it as a motion for a preliminary injunction generally—regardless of how much that injunction might resemble the state-court TRO.

generally useful for the district court to analyze all four of the preliminary injunction factors." *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 n.3 (6th Cir. 2000)). Rather than function as "rigid and unbending requirements[,]" the factors "simply guide the discretion of the court." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992) (citation omitted).

"The party seeking a preliminary injunction bears the burden of justifying such relief." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) (citations omitted). While a party seeking a preliminary injunction need not "prove [its] case in full at a preliminary injunction hearing," *Tenke*, 511 F.3d at 542 (citations omitted), a preliminary injunction is an "extraordinary and drastic remedy." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), and "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739.

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

MRO's pending claims against Kasinger include breach of contract and a corresponding declaratory judgment. (*See* Doc. 46, at 36–37.) There are three elements to a breach-of-contract claim under Tennessee law, which governs the Agreement under its own terms (*see* Doc. 45-3, at 3): "[1] the existence of a valid and enforceable contract, [2] a deficiency in the performance amounting to a breach, and [3] damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).

Kasinger's response to MRO's motion focuses primarily on an argument that he cannot be liable for breaching the Agreement because he works for Automation Hub remotely, at a location that is outside the territorial range of the noncompete provision. (*See* Doc. 51, at 6–10.) The Court find this theory unpersuasive, at least at this preliminary stage of the litigation.[10] Kasinger does not dispute that Automation Hub is located within the territorial limit of the noncompete provision, and he cites no authority to suggest that the location of his remote work should obviate the location of his worked-for employer. (*See generally* Doc. 51.) On the contrary, given the logic and rationale of noncompete clauses generally, it seems to the Court that what should matter is the *effects* of a former employee's subsequent labor—or the location of the market in which the alleged improper competition takes place—not the physical location where the former employee sits while he does that work. *See Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005) (outlining the general function and rationale of noncompete clauses). For instance, in *NetRoadshow, Inc.v. Carrandi*, the Northern District of Georgia found an employer "demonstrate[d] a substantial likelihood of success on the merits" of its claim that a former employee breached a noncompete clause *even though* the former employee had worked remotely when employed by the plaintiff-employer, apparently focusing on the location of the worked-for-remotely offices rather than the location of the remote work. 2024 WL 947802, at *7–8 ("there is no dispute that Defendant 'actually worked' at all of Plaintiff's three (3) offices in Atlanta, New York City, and London, although her everyday work may have been largely performed on a remote basis") (vacated on other grounds, *NetRoadshow,*

---

[10] Even in a time where remote work has become quite common, Kasinger's theory of remote work as evading noncompete liability appears to be a somewhat novel legal argument. However, given the doubts the Court will outline in the remainder of this paragraph, it wonders whether this territory has gone largely uncharted for good reason.

*Inc. v. Carrandi*, 2024 WL 2158715).  Furthermore, while Kasinger may claim it is unfair to enforce the Agreement against him in Benton, Arkansas, nothing in the Agreement would stop him from working for a new employer whose business was itself located in Benton (or anywhere else outside the territorial limit).  (*See* Doc. 51, at 7.)  Still, notwithstanding the Court's concerns with this remote-work argument, it is MRO's burden as the party seeking the preliminary injunction to demonstrate its likelihood of success on its merits.

The Court finds MRO has not shown a strong likelihood of success on its contract claims for two key reasons:  (1) it is not entirely clear that the Agreement's restrictive covenants—particularly the noncompete clause—were ever enforceable against Kasinger given that it was executed in connection with an internship that ended months before Kasinger became an employee; and (2) even assuming those covenants were enforceable initially, it is not clear that the Agreement's provisions persisted beyond the duration of his internship.  In many contexts, interns—whose positions may be temporary and/or unpaid—are understood to occupy a different legal status than at-will employees.  The line between intern and employee is litigated regularly, for instance, in Fair Labor Standards Act (FLSA) cases.  *See*, *e.g.*, *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 536–37 (2d Cir. 2016) (discussing when interns are employees under the FLSA); *Solis v. Laurelbrook Sanitarium and School, Inc.*; 642 F.3d 518, 522–23 (6th Cir. 2011) (discussing when student workers are employees under the FLSA).

MRO cites no authority, and the Court is aware of none, supporting the specific proposition that noncompete clauses are enforceable against interns under Tennessee law.  There is reason to think the peculiar status of interns may matter in this context, furthermore, because Tennessee law already views restraints on trade, and especially noncompete clauses, as suspect.  *See Murfreesboro Med. Clinic*, 166 S.W.3d at 678 ("In general, covenants not to compete are

11
Case 1:24-cv-00268-TRM-MJD    Document 62    Filed 07/18/25    Page 11 of 18
PageID #: 1018

disfavored in Tennessee") (citing *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984)). As the *Murfreesboro Medical Clinic* court explains, "[t]hese covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the employee. However, if there is a legitimate business interest to be protected and the time and territorial limitations are reasonable then non-compete agreements are enforceable." 166 S.W.3d at 678 (internal citation omitted). To determine whether such restrictive covenants are reasonable, and thus enforceable, Tennessee courts consider four factors: "(1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest." *Id.*; *see also Columbus Med. Servs., LLC v. Thomas*, 308 S.W.3d 368, 394 (Tenn. Ct. App. 2009) (construing this four-factor test as applying to "restrictive covenant[s]" generally, not just noncompete clauses). Crucially, the consideration factor may be a question of *degree*—not merely whether any consideration exists—such that Tennessee courts consider whether the consideration is "adequate" or sufficient to support the covenant at issue. *See Cent. Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 33 (Tenn. 1984). Applying this test, Tennessee courts have found that at-will employment is adequate consideration for noncompete clauses, *see id.* (citing *Ramsey v. Mut. Supply Co.*, 427 S.W.2d 849, 852 (Tenn. Ct. App. 1968)); is it unclear whether an internship could likewise provide adequate consideration.

Here, MRO has not established that there was adequate consideration for the restrictive covenants in the Agreement. In addition to the broader uncertainties regarding whether noncompete clauses can be enforced against interns under Tennessee law, there are notable gaps in the factual record before the Court. The record shows that Kasinger worked for MRO Arkansas as a summer intern between June 13, 2019, when he signed the Agreement, and July

19, 2019.  (*See* Doc. 45-1, at 2.)   However, it is not clear from the parties' submissions on this motion (a) whether Kasinger's internship was paid, nor (b) whether the Agreement was executed in anticipation of his being hired as an at-will employee in the future.[11]  (*See generally* Docs. 45, 51, 54.)  Thus, MRO has not established a strong likelihood that the Agreement was enforceable against Kasinger when it was executed.

Even if the Agreement were enforceable initially, MRO has not shown a strong likelihood of success because it has not established the duration of the Agreement's application. The Agreement was executed on the first day of Kasinger's internship, and it contains no express language on whether its provisions might persist past the conclusion of that internship.  (*See* Doc. 45-3.)  To the Court's reading, insofar as the Agreement's written text does address the duration of its application, its provisions are conflicting and, thus, ambiguous.  *See Individual Healthcare Specialists, Inc. v. Bluecross Blueshield of Tenn., Inc.*, 566 S.W.3d 671, 676 (Tenn. 2019) ("the written words are the loadstar of contract interpretation").  The first recital of the Agreement reads as follows, with Kasinger's name hand-written in a blank, underlined space:

> WHEREAS, Employee desires to be employed, or to continue to be employed, by the Company as <u>*Caleb Kasinger*</u>, and the Company desires to continue to employ Employee in that position; and . . .

---

[11] This litigation is currently in an unusual procedural posture because this motion for a preliminary injunction (which was filed nearly nine months into the litigation) has been pending at the same time as a motion by Kasinger for summary judgment (Doc. 55; filed on June 5, 2024, the date Kasinger's response to the amended complaint was due, and over six months in advance of the dispositive motion deadline).  The Court is aware that, in response to Kasinger's motion for summary judgment, MRO has submitted evidence—a *second* affidavit by CEO Russell Looper (Doc. 58-3)—that addresses these factual questions at least to some extent.  However, MRO's submissions on its motion for a preliminary injunction contain no such details.  Even if the Court could consider the summary judgment record on this motion for a preliminary injunction, furthermore, it would still find MRO has failed to establish a strong likelihood of success on the merits because (as the remainder of this section will discuss) the Agreement's duration is ambiguous.

(Doc. 45-3, at 1.)  Given the plain language of this clause, it appears Kasinger was meant to fill in his *position* on the blank line, but—perhaps reflecting his greenness at the time—he wrote his name instead.  (*See id.*)  More importantly, the text of this recital, which colors the provisions that follow, suggests the Agreement applied only for the duration of the position in which Kasinger was hired—his internship:  "Employee desires to be employed, or to continue to be employed . . . and the Company desires to continue to employ Employee *in that position*."  (*Id.* (emphasis added).)  There is also no evidence in the record that the parties amended the Agreement, or executed a new one, in anticipation of Kasinger's subsequent full-time employment, which began several months after his internship concluded, or in relation to his later promotions.  (*See generally* Docs. 45, 51, 54.)  These facts support a finding that the Agreement applied only for the duration of Kasinger's internship, which would mean its restrictive covenants applied only through July 19, 2020, given the one-year periods of the noncompete and nonsolicitation clauses, such that the Agreement ceased to bind him long before he began working for Automation Hub.  (*See* Doc. 45-3, at 1–2.)

There is also some language in the Agreement that can be construed to mean its restrictive covenants applied for the duration of Kasinger's employment with MRO, regardless of any changes in his position.  The noncompete clause begins, "Upon Employee's *termination of employment* with the Company for any reason. . ."  (*Id.*, at 1.)  But this language can only go so far for MRO, for two reasons.  First, the record shows Kasinger was not working for MRO in any capacity between July 19, 2019, and his full-time start date of February 27, 2020, which suggests the last day of his internship may have also been the end of his "employment" for purposes of the Agreement (Doc. 45-1, at 2); thus, this language is arguably consistent with an interpretation that the one-year period of the Agreement's restrictive covenants expired on July

14

19, 2020.  Second, the Agreement must be construed in favor of Kasinger—both (a) because it contains restraints on trade and therefore must be construed against MRO, the employer; and (b) because it is ambiguous and therefore must be construed against MRO, the drafter.  *See Murfreesboro Med. Clinic*, 166 S.W.3d at 678 (restraints on trade must be "construed strictly in favor of the employee"); *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006) ("An ambiguous provision in a contract generally will be construed against the party drafting it.").  Thus, given that the Agreement's text is clearly susceptible to the interpretation that it applied only for the duration of Kasinger's internship and that, in any case, it must be construed in his favor, MRO has not established a strong likelihood that the restrictive covenants at issue in this litigation applied when Kasinger began working for Automation Hub.

Accordingly, MRO has not shown a strong likelihood of success on the merits.

### B.  Equitable Factors

A preliminary injunction is an "extraordinary and drastic remedy"—even when a plaintiff is likely to succeed on the merits, preliminary relief may not be warranted when the equitable factors are lacking.  *See Fowler*, 924 F.3d at 256.  Here, the equitable factors do not support MRO's motion.

MRO contends it will suffer irreparable harm in the absence of a preliminary injunction because, "[i]f Kasinger is allowed to continue to directly compete with MRO and solicit MRO's customers and venders for Automation Hub's benefit, MRO will lose the goodwill it spent over twelve years to build," and that such a result would be "patently unfair."  (Doc. 45, at 17.)  MRO's claim that Kasinger's actions have caused such drastic, irreversible damage to its business is belied, however, by the fact that it waited over eight months after this litigation was removed to federal court to file this motion for preliminary relief.  (*See* Docs. 1, 44, 45.)  To the

extent MRO may have relied instead on the state-court-issued TRO for some time earlier in this litigation, that fails to explain why it waited so long to file this motion because, at least as far back as its response to Kasinger's motion to dismiss (dated November 15, 2024), MRO has maintained that Kasinger has been in violation of the state-court TRO from the day it was issued. (*See* Doc. 21, at 5 ("But that court order did not stop Kasinger from interfering with Manufacturing Repair's business. The very day that the Circuit Court entered the order, Kasinger. . .").) If, indeed, the state-court TRO has done nothing to deter Kasinger's allegedly improper conduct, and that improper conduct has already done such catastrophic damage, it is unclear why MRO would be content to wait so long—nearly a year after the state-court TRO was issued on May 3, 2024—to move to "convert" it to a preliminary injunction in this Court. MRO also contends it has shown irreparable harm because the Agreement provides that any breach of its provisions "will cause the Company irreparable injury and damage." (Doc. 45, at 17–18.) But MRO cites no authorities to suggest contractual language can be determinative as to Rule 65's equitable factors, and the Court is concerned that allowing parties to contract into such a result would be inconsistent with the "extraordinary" nature of preliminary injunctions. *See Fowler*, 924 F.3d at 256. The irreparable-harm factor, therefore, offers mixed support for MRO at best.

The remaining equitable factors—whether a preliminary injunction would cause substantial harm to others and the public interest—counsel against granting MRO's motion. *See Certified Restoration Dry Cleaning Network*, 511 F.3d at 542. As the Court found as to MRO's likelihood of success on the merits, (1) it is unclear whether the Agreement's restrictive covenants were ever enforceable against Kasinger given his intern status, and (2) even assuming the Agreement was enforceable initially, there is a substantial possibility that it ceased to apply

long before Kasinger began working for Automation Hub. Here, particularly given the second possibility, granting MRO's motion could effectively *alter the terms of the Agreement* by extending its restrictive covenants past their original one-year expiration dates. (*See* Doc. 45-3, at 1–2.) It goes without saying that under these circumstances, entering a preliminary injunction against Kasinger, which would likely leave him out of a job, would cause him substantial and undue harm. *See Certified Restoration Dry Cleaning Network*, 511 F.3d at 542. And given the Court's foundational obligations to attend to the written text of contracts and give effect to the intentions of contracting parties, it would be improper and injurious to the public interest for this Court to enter a preliminary injunction that risks enlarging the parties' obligations under the Agreement in contravention of its text. *See Individual Healthcare Specialists*, 566 S.W.3d at 688 ("The common thread in all Tennessee contract cases—the cardinal rule upon which all other rules hinge—is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles."). For these reasons, the Court finds the equitable factors do not support issuance of a preliminary injunction.

## IV. CONCLUSION

For the foregoing reasons, MRO's motion for a preliminary injunction (Doc. 44) is hereby **DENIED**.

Additionally, given the above analysis and that the factors for granting a preliminary injunction under Rule 65 are identical to those for granting a TRO, the state-court TRO, to the

extent it may have been enforceable by the Circuit Court for Hamilton County, Tennessee previously,[12] is hereby **DISSOLVED** pursuant to 28 U.S.C. § 1450.[13]

    **SO ORDERED.**

                                            /s/ *Travis R. McDonough*
                                            **TRAVIS R. MCDONOUGH**
                                            **UNITED STATES DISTRICT JUDGE**

---

[12] Because the TRO does not provide an expiration date, it is unclear for how long it would have been enforceable by the state court.

[13] 28 U.S.C. § 1450 provides, "[w]henever any action is removed from a State court to a district court of the United States . . . [a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect *until dissolved or modified* by the district court." (Emphasis added.)